IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 21, 2010 Session

**STATE OF TENNESSEE v. CECRET C. WILLIAMS**

**Appeal from the Criminal Court for Davidson County**
**No. 2006-B-1272     Monte Watkins, Judge**

---

**No. M2009-01739-CCA-R3-CD - Filed November 17, 2010**

---

The Defendant, Cecret C. Williams, was charged with one count of aggravated child abuse and one count of aggravated child neglect.  Following a jury trial, she was convicted of both offenses; however, the trial court merged the two counts.  In this direct appeal, the Defendant contends that: (1) the evidence was not sufficient to convict her on either count; (2) the trial court erred in failing to fulfill its duties as the thirteenth juror; and (3) the trial court erred in entering separate judgments and sentences for each of her convictions.  After reviewing the record, we conclude that the trial court misconstrued its authority to grant a new trial under the thirteenth juror rule, Rule 33(d) of the Tennessee Rules of Criminal Procedure.  We accordingly reverse and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Katie Weiss and Jonathan Augusta Assistant Public Defenders (at trial) and Jeffrey A. DeVasher Assistant Public Defender (on appeal), Nashville, Tennessee, for the appellant, Cecret C. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General,  for the appellee, State of Tennessee.

**OPINION**

## Factual Background

On May 22, 2006, a Davidson County grand jury issued a two-count indictment that alleged that the Defendant committed aggravated child neglect and aggravated child abuse on March 6, 2004, against her then seven-month-old son, M.W. The Defendant's trial was held on March 9-10, 2009.

Lieutenant William Watkins, of the Metropolitan Nashville Police Department, testified that on March 6, 2004, he worked as a detective in the Youth Services Division and responded to Vanderbilt Children's Hospital to investigate injuries that M.W. had sustained. He said that he interviewed the Defendant at the hospital and recalled that she told him that she had been at her friend LaQuita Goodner's apartment, where she was cooking dinner and M.W. was taking a nap. He testified that the Defendant told him that she decided to take M.W. back to her apartment, which was several doors down, so that the other children would not wake him up. Lieutenant Watkins stated that the Defendant said that she placed M.W. in his playpen and went back to her friend's apartment. He also recalled the Defendant saying that, several minutes later, she asked her friend's nine-year-old son, Lamonderaus Goodner, to go to her apartment and get a tomato, and that he reported back that M.W. was injured and crying. Lieutenant Watkins said that the Defendant said that her five-year-old son, S.W., admitted to "[p]icking the baby up and throwing him on the couch and onto the floor, and also striking him in the head with a wicker handle from an Easter basket, pinkish/reddish in color, on the face." The Defendant also claimed that S.W. had "climbed into the playpen and then threw [M.W.] out." Lieutenant Watkins testified that the Defendant told him that, when S.W. was two or three years old, her then eight or nine-year-old daughter severely beat S.W. with a belt.

On cross-examination, Lieutenant Watkins testified that, during his investigation, no one stated that M.W. had any observable injuries while he was over at Ms. Goodner's apartment. He also acknowledged that in the Defendant's arrest warrant, dated August 16, 2004, he wrote that he suspected S.W. injured M.W.

Sheri Goodwin testified that she works for the Department of Children's Services (DCS) and that she investigated M.W.'s injuries with Lieutenant Watkins. She testified that she interviewed the Defendant at the hospital with Lieutenant Watkins and that the Defendant said she took M.W. back to her apartment, "got him calmed down, put him in the playpen, and got him to sleep." She also testified that the Defendant said she sent Lamonderaus Goodner to get a tomato from her apartment and "that he came running back down and said . . . that the baby, [M.W.], had bruises on him in the playpen." Ms. Goodwin testified that it was her understanding that all of the children were playing in the courtyard

at the time and that M.W. would have been alone in the apartment. Ms. Goodwin further testified as follows:

> [The Defendant] said that she went to her apartment and looked at [M.W.] in the playpen, and she noticed the red whelps on the face. She said he was not crying, he was just laying there. She then heard [S.W.] upstairs and she asked him what happened and he said, at first, that someone came in and hit the baby and then he later said that he was the one that had hit the baby.

Ms. Goodwin recalled that the Defendant said S.W. had hit M.W. with a red stick.

Ms. Goodwin testified that the Defendant's children were removed from her care on March 6, 2004. She also said that, approximately three weeks later, the juvenile court held a probable cause hearing to determine whether the Defendant's children should be returned to her. Ms. Goodwin recalled that, at that time, the Defendant told her that Lamonderaus Goodner was the person who brought M.W. back to her apartment. The Defendant admitted that she had originally lied, and explained that she said she brought M.W. back to her apartment because she did not want Lamonderaus Goodner to take the blame for something S.W. did.

Ms. Goodwin acknowledged that, during her investigation, no one said they saw the Defendant hurt M.W., and no one saw any injuries on M.W. when he was at Ms. Goodner's apartment. Ms. Goodwin also stated that her dictation from July 19, 2004, indicated that all of the evidence she had pointed to S.W. as the alleged perpetrator. She further elaborated, "[F]rom all of the statements from everybody, was that [S.W.] was still saying he did it and that is all we had at that point." Ms. Goodwin also testified that, in her experience as a DCS investigator, she had never seen a case where a five-year-old child caused injuries to a sibling in the magnitude of the injuries inflicted on M.W.

Melissa Crumpton testified that she worked for DCS as a social worker and had contact with the Defendant and her children in 2003 and 2004. Ms. Crumpton testified that she was around the Defendant's children two to four times per month and had observed S.W. interact with M.W. each time. She recalled, "[S.W.] was always very loving towards [M.W.] and to all of his siblings and very protective of all of them." Regarding M.W.'s injuries, Ms. Crumption said, "I never accepted [S.W.] being the one that did that. [S.W.] would never do that."

Dr. Deana Smith-Bell[1] testified that she treated M.W. when he came into the Vanderbilt Children's Hospital emergency room in March 2004. She recalled:

> There were several things that were immediately very concerning about him. He had multiple parallel linear streaks, about ten to twelve of those that I could count, that were evolving over his right face, temporal and parietal areas. Those ended in breaks in the skin back over the parietal area.
>
> . . . .
>
> So these streaks actually started on the right side of his face and extended across his back ending in breaks in the skin, back here towards the back. (Indicating).
>
> Also in this back area, the parietal area, there was a four by three centimeter or so, almost a two by two inch area, of boggy[2] scalp. When I pressed down on it, it actually went in so I was very concerned about that immediately. . . . Also there were small lip-shaped lesions all over the left face and the left temporal area. . . . There were similar lesions on the chest and on the abdomen, and then a large lesion actually on the right-lower abdomen.

She also testified that in two places on M.W.'s right parietal scalp, "the bone had actually moved in towards the brain a little bit." She testified that a "tremendous amount of force" would have been needed to produce such an injury. When asked whether these injuries were consistent with M.W. being dropped by his sibling after being removed from his playpen, Dr. Smith-Bell testified that a fall from that height would not cause a fracture such as the one M.W. had sustained. She elaborated, "This type of injury usually requires a tremendous amount of force, so an accelerating impact against a hard surface. We most commonly in pediatrics see it as a result of an adult taking a child and hitting the head against a hard surface."

Dr. Smith-Bell testified that she thought M.W.'s injuries "were relatively recently sustained" because initially she could not feel the streaks that crossed his face, but "[o]ver time they became whelps." She also stated that the boggy area on M.W.'s head was bleeding when he came to the hospital, and that indicated that it was "a very recent injury." She

---

[1] The parties stipulated that Dr. Smith-Bell was an expert in pediatrics.

[2] Dr. Smith-Bell later testified that a boggy area "gives in when you press on it" and that it is "a large area that actually represented soft tissue swelling over the fractured area."

-4-

agreed that, to create M.W.'s injuries, at least eighteen different traumatic blows had to have been inflicted. Dr. Smith-Bell testified that she diagnosed M.W.'s injuries as being inflicted by non-accidental trauma. She also testified that she was "quite certain" M.W.'s injuries "were caused by a post-pubescent child or an adult because of the force required for the parietal skull fracture."

Dr. Smith-Bell stated that she spoke with the Defendant and said that her notes documented the following:

> A seven-month-old male presents with mother and maternal great aunt. The mother reports that her friend lives six houses—six houses down from her. She and her friend have six children combined. They were going to cook dinner for all six children at the friend's home. The mother took her children to her friend's home where she and her friend started preparing.

> The mother states that she and her friend sent the older children outside to play so that the three younger children could take naps. The older children kept coming in and awaking [M.W.] so the mother took [M.W.] back to her own home six houses down the street.

> The mother states she placed [M.W.] in his playpen and made sure he was asleep. She then returned to the friend's house down the street leaving the child unattended. The mother states that she then sent the nine-year-old child of her friend to her own home to get a tomato. The nine-year-old child left and returned telling the mother that her five-year-old son was "whipping [M.W.] with the red stick."

> Mother states that she left her friend's house and went to her own home immediately to check on [M.W.]. She states that she entered her home to find [M.W.] where she left him in the playpen. He was conscious but not crying and had red streaks on his face.

> She states she asked her five-year-old son what happened and he stated, "Someone came in the house and hit him." She states she pressed the five-year-old for a response that was the truth and he stated that, "He did it." The mother states this happened at approximately 6:15 p.m. She gave [M.W.] Tylenol, put a cold cloth on his face, and returned to her friend's home to let her other children finish dinner prior to coming to the emergency room.

I asked if the sibling had injured [M.W.] before and she re[p]lied, No. I examined the child and explained that the nature and pattern of his injury necessitates DCS involvement.

When asked whether she thought a five-year-old was capable of making the striations on M.W.'s face, Dr. Smith-Bell replied:

No. I don't think that a five-year-old would be able to do this because there are very different bases of precision and the degree to which these marks are parallel—also there are very few stray marks on that side of the face.

Typically, if you see a five-year-old trying to do something like this, you will see lots of different stray marks where they kind of went back and forth rather than repetitively in the same direction with the same amount of force. Typically, the striations cross over one another and you would see other smaller marks from the end of the instrument on the face.

Dr. Smith-Bell also agreed that a five-year-old would not have the physical strength and coordination to pick up M.W. from his playpen and throw him out of it.

On cross-examination, Dr. Smith-Bell acknowledged that the lip-shaped marks she saw on M.W., which were typical of marks made by pinching the skin, could have been inflicted by a person younger than an adult. She also testified that M.W.'s skull could have been fractured if he was dropped from a height of more than thirty-six inches.

The defense presented the testimony of Lamonderaus Goodner, who was fourteen years old at the time of the trial. He testified that, on the afternoon of March 6, 2004, he took M.W. to the Defendant's apartment and put him in his playpen. He stated that, about ten minutes later, the Defendant and Ms. Goodner asked him to get a tomato and check on M.W. He said that, when he got into the apartment, he saw S.W. standing on the stairs while hitting M.W. in the face with a switch. He then saw S.W. drop M.W. down about four steps. He testified that he told S.W. to stop and then ran to tell the Defendant.

On cross-examination, the State questioned Lamonderaus Goodner about differences between the testimony he gave at trial and testimony he had previously given. The State pointed out that Lamonderaus Goodner had previously said he saw S.W. hitting M.W. in the living room and that he saw S.W. hitting M.W. on his back and naval, not his face. The State also noted that Lamonderaus Goodner previously testified that M.W. was sitting up in his playpen while S.W., standing outside of the playpen, was hitting him. In earlier testimony, Lamonderaus Goodner said that he never saw S.W. drop M.W. When confronted with the

-6-

inconsistent testimony, Lamonderaus Goodner could not offer any explanation. He did, however, agree that his memory of the incident, which happened five years before, had been "pretty much destroyed."

Ms. Goodner testified that her apartment was "four to five doors down" from the Defendant's apartment. She said that the Defendant asked Lamonderaus Goodner to take M.W. to the Defendant's apartment and put him in the playpen. She said that, later, the Defendant asked Lamonderaus Goodner to get something from her refrigerator and she recalled, "[H]e was there maybe seconds, he ran back to my home and told [the Defendant] that he witnessed [S.W.] hitting her son." She testified that the Defendant left to go get M.W. and that, when she came back to Ms. Goodner's apartment, Ms. Goodner saw that M.W. was bruised. She testified that she did not see any bruises on M.W. before her son took him to the Defendant's apartment.

On cross-examination, the State questioned Ms. Goodner about why she would have told Detective Watkins, just ten days after the incident, that the Defendant was the one who took M.W. back to her apartment, not her son. However, Ms. Goodner denied ever saying that to the detective and maintained that she always said her son took M.W. to the Defendant's apartment. She also testified that she never witnessed S.W. doing anything violent toward M.W. However, she recalled, "We was sitting in the living [room] and I'm like, [S.W.], what happened? You know, he was like he whipped his brother. Maybe he did it because she whoops them."

The State re-called Lieutenant Watkins, who said that he interviewed Ms. Goodner on March 16, 2004. He testified that Ms. Goodner stated that it was the Defendant, not Ms. Goodner's son, who took M.W. back to the Defendant's apartment.

On March 11, 2009, the jury convicted the Defendant of both aggravated child neglect and aggravated child abuse. On May 15, 2009, the same day as her sentencing hearing, the Defendant filed a motion asking the trial court to act as the thirteenth juror, per Rule 33(d) of the Tennessee Rules of Criminal Procedure; however, the court denied the motion. Although the trial court noted that the Defendant's two convictions should merge, the court issued two separate judgments that reflected, on each count, the Defendant was sentenced as a violent offender to sixteen years at 100%. On June 29, 2009, the trial court denied the

Defendant's motion for new trial, which was filed on June 17, 2009.[3] The Defendant now appeals.

## Analysis

### I. Thirteenth Juror

The Defendant contends that "the trial court erred in failing to fulfill its duties as thirteenth juror." On May 15, 2009, the trial court held the Defendant's sentencing hearing. However, before it discussed her sentence, the trial court heard arguments regarding the Defendant's motion for it to act as the thirteenth juror. The trial court stated as follows:

> I believe the [c]ourt did accept the jury's verdict. This was a circumstantial case. And I listened to it very carefully. But the jury rendered it's [sic] verdict as to each count. Those counts merged into a single count. The [c]ourt accepts the jury's verdict. The motion is denied.

Then, immediately after the court's comments, the sentencing-portion of the hearing began. At the conclusion of the parties' arguments regarding sentencing, the trial court said as follows:

> Well, what we have here is a relatively young lady who was convicted on two separate counts, although the [c]ourt instructed the jury to only convict on one or the other. But as you know, things happen in [c]ourt that you don't always predict. As the [c]ourt stated earlier this was a circumstantial case, and the jury deliberated and found the defendant guilty on both counts. The [c]ourt is not going to disturb the jury's verdict, although the [c]ourt is not altogether convinced that she may be the one that did it, although, again, it was left up to the jury and I am not going to disturb that verdict.

On June 29, 2009, at the hearing for the Defendant's motion for a new trial, the trial court stated as follows:

> As the [c]ourt previously stated—at least believes that it has previously stated, this was a circumstantial case. It was a close call. But when you have a circumstantial case the jury has the right to find the defendant guilty or not

---

[3] In both her brief and at oral argument, the Defendant acknowledged that her motion for new trial appears to be untimely, however she requests that her timely-filed motion for the trial court to act as the thirteenth juror be treated as her motion for new trial. The State has not opposed the Defendant's request and we will treat her thirteenth juror motion as her timely-filed motion for new trial.

guilty. And in this particular case the jury found the [D]efendant guilty. And the [c]ourt is going to respectfully deny the motion for new trial.

Tennessee Rule of Criminal Procedure 33(d)[4] states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence. Upon request of either party, the new trial shall be conducted by a different judge." Our supreme court has concluded that this rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). Rule 33(d) requires that "[t]he trial judge must be personally satisfied with the verdict." State v. Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995). "The purpose of the thirteenth juror rule is to be a 'safeguard . . . against a miscarriage of justice by the jury.'" State v. Price, 46 S.W.3d 785, 823 (Tenn. Crim. App. 2000) (quoting State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995)). The rationale behind the rule is that "[i]mmediately after the trial, the trial court judge is in the same position as the jury to evaluate the credibility of witnesses and assess the weight of the evidence, based upon the live trial proceedings." Moats, 906 S.W.2d at 434.

In Carter, the supreme court stated that the trial court does not have "to make an explicit statement on the record" regarding its ruling on a Rule 33(d) motion. 896 S.W.2d at 122. The court explained that, "when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict." Id. However, "where the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, an appellate court may reverse the trial court's judgment." Id.; see State v. George Washington Matthews, No. M2009-00692-CCA-R3-CD, 2010 WL 3210499, at *4 (Tenn. Crim. App., Nashville, Aug. 13, 2010) (remanding the case for a new trial because the comments of the trial court "indicated that he simply deferred to the jury result in deciding to overrule the motion for new trial"). Moreover, in Moats, the court noted that "when a trial court chooses to comment on the record about its thirteenth juror determination, the ruling should be clear and unequivocal." 906 S.W.2d at 435. If the reviewing court finds "that the trial court failed to act as the thirteenth juror or misconstrued its authority under that rule," then the remedy is a new trial. Id.

---

[4] We note that the Tennessee Rules of Criminal Procedure were revised on July 1, 2006, and the "thirteenth juror rule," Rule 33(f), became Rule 33(d). The 2006 revisions made some slight language changes, but the substance of the rule under review did not changed. We mention the change in numbering because many of the cases we cite herein refer to Rule 33(f).

In <u>Moats</u>, when the trial court ruled on the defendant's motion for it to act as the thirteenth juror, the court stated as follows:

> [T]he case was a difficult to try. [sic] There was a great deal of evidence that caused this [c]ourt concern, ah, throughout the trial of this case. I am saying that on the record.
>
> Nevertheless, I think that upon reviewing the testimony, and the conclusion of the jury, the [c]ourt feels that the jury came to what, ah, was a reasonable conclusion, if they looked at it as the [c]ourt feels it must consider that they looked at it. . . . I don't think that the [c]ourt can willy-nilly decide that somebody is entitled to a new trial. I think that I have to find that the jury did not have sufficient evidence to conclude what it concluded. I think that in this matter the jury did have sufficient evidence to come to a conclusion along that line. And, ah, I don't feel that it is appropriate for me to overturn that jury's conclusion at this time.
>
> However, for the record, this court has had difficulty with the, ah, with the proof in this matter.

<u>Moats</u>, 906 S.W.2d at 433. Concluding "that the record reflect[ed] that the trial court did not believe that the weight of the evidence supported the jury's verdict, but refused to grant a new trial because the evidence was legally sufficient to support the verdict," the supreme court granted the defendant a new trial because "the trial court misconstrued its authority to grant a new trial under the thirteenth juror rule." <u>Id.</u> at 435.

The first issue in the instant case is whether we should even consider the comments that the trial court made during the sentencing-portion of the hearing on May 15, 2009, and those made at the June 29, 2009 hearing regarding the Defendant's motion for a new trial. During oral argument before this Court, the State attempted to distinguish the various comments the trial court made and argued that we should only consider the statements made when it specifically denied the Defendant's thirteenth juror motion. However, we decline to do so.

Upon examination of the record and the statements at issue, it is clear to us that the trial court was referring to its earlier denial of the Defendant's thirteenth juror motion, when it said:

> As the [c]ourt stated earlier this was a circumstantial case, and the jury deliberated and found the defendant guilty on both counts. The [c]ourt is not

-10-

going to disturb the jury's verdict, although the [c]ourt is not altogether convinced that she may be the one that did it, although, again, it was left up to the jury and I am not going to disturb that verdict.

In our view, the trial court's statements must be reviewed in their entirety. There is no logical reason that the trial court would discuss disturbing the jury's verdict if it had in fact, as the State argues, moved on from that topic and proceeded to only a consideration of sentencing. Moreover, the fact that the trial court's statements occurred within a close temporal proximity to its ruling on the thirteenth juror motion is compelling. The statements above were made on the same day, during the same hearing, and only twenty-six transcript pages apart from its decision to deny the Defendant's motion.

Regarding the trial court's comments on June 29, 2009, at the hearing for the Defendant's motion for a new trial, although they are not dispositive, we conclude that they help provide insight into the trial court's rationale to deny the thirteenth juror motion and the trial court's understanding of its authority under Rule 33(d). In reviewing a trial court's denial of a thirteenth juror motion, this Court has previously examined statements made during a sentencing hearing and a hearing for a motion for new trial. See State v. Darrell S. Miller, No. W2000-01306-CCA-R3-CD, 2002 WL 1482788, at *8 (Tenn. Crim. App., Jackson, Feb. 14, 2002) (noting the trial court's comments at the sentencing hearing and motion for new trial hearing, and concluding that "[t]he trial court's comments do not indicate that the court was dissatisfied with the jury's verdict or that the trial court failed to act as thirteenth juror"); State v. Ayers, No. E2000-03074-CCA-R3-CD, 2001 WL 1328533, at * 3 (Tenn. Crim. App., Knoxville, Oct. 29. 2001) (observing that "both the tone and content of the comments made by the trial judge during the sentencing hearing signal a satisfaction with the verdict" and finding that the "statements made at the sentencing hearing establish that the trial court was satisfied with the finding of guilt"). Thus, we will analyze whether the trial court correctly denied the Defendant's thirteenth juror motion in the context of all three statements.

Upon examination of the trial court's statements, we must conclude that it failed to act as the thirteenth juror in the Defendant's case. First, it is apparent that the trial court's ruling was not "clear and unequivocal." The court stated, "The [c]ourt is not going to disturb the jury's verdict, although the [c]ourt is not altogether convinced that she may be the one that did it,[5] although, again, it was left up to the jury and I am not going to disturb that verdict." Second, the fact that the trial court was "not altogether convinced that she may be the one that did it," indicates that the trial court was not "personally satisfied with the

_____

[5] We note that the State did not proceed on, nor was the jury instructed about, a theory of criminal responsibility in this case.

verdict." Finally, the trial court appears to have improperly deferred to the jury verdict, rather than acting as the thirteenth juror. Despite saying that it was "not altogether convinced" that the Defendant committed the offense, the trial court stated it was "not going to disturb the jury's verdict." Furthermore, at the hearing on June 29, 2009, the court said, "It was a close call. But when you have a circumstantial case the jury has the right to find the defendant guilty or not guilty. And in this particular case the jury found the [D]efendant guilty." Accordingly, we must conclude that the trial court misconstrued its authority to grant a new trial under the thirteenth juror rule, Rule 33(d) of the Tennessee Rules of Criminal Procedure. Thus, we must reverse and remand for a new trial.

## II. Sufficiency

The Defendant contends that the State presented insufficient evidence to convict her of aggravated child abuse and aggravated child neglect. However, we conclude that this issue is rendered moot by our conclusion that the trial judge should have granted her a new trial.

## III. Separate Judgments

The Defendant contends that only one judgment of conviction should have been entered, and the State does not disagree. Although this issue is now moot, we will discuss it in order to provide guidance to the trial court, in the event that a future jury returns guilty verdicts on both the aggravated child abuse and aggravated child neglect charges.

In its instructions, the trial court informed the jury that they could convict the Defendant of aggravated child abuse or aggravated child neglect, but not both. See State v. Vernita Freeman, No. W2005-02904-CCA-R3-CD, 2007 WL 426710, at *9 n.2 (Tenn. Crim. App., Jackson, Feb. 6, 2007) ("Obviously, if the State is proceeding upon alternative theories, the jury should be instructed that they can find the defendant guilty of one or the other of the theories, but not both."). However, the jury returned guilty verdicts on both counts. At the Defendant's sentencing hearing, the trial court sentenced her to sixteen years on each count, but stated, "And these will merge together." Two separate judgments were entered, reflecting convictions and sentences on both counts, however, "sentences merge" was written on each judgment form. In a case such as this one, when two offenses merge, it is proper to enter only one judgment of conviction. See State v. Blake Delaney Tallant, No. E2006-02273-CCA-R3-CD, 2008 WL 115818, at *24 (Tenn. Crim. App., Knoxville, Jan. 14, 2008) (noting that "the trial court entered separate judgments of conviction for aggravated child abuse based on the alternative theories of abuse and neglect" and holding, "In other words, the trial court entered judgments of convictions based on two violations of the same statute. Our review of this case leads us to conclude that these convictions constitute a double jeopardy violation."); State v. Zachary V. Henning, No. W2005-00269-CCA-R3-CD, 2007 WL 570553, at *4 (Tenn. Crim. App., Jackson, Feb. 23, 2007) ("On

remand, the trial court should vacate the judgments of conviction of aggravated assault, including the sentence, and of theft and amend the judgment of conviction of aggravated robbery to reflect the merger of both the findings of guilt of aggravated assault and theft."); State v. Brandon Wallace, No. W2005-02514-CCA-R3-CD, 2006 WL 3208557, at *3 (Tenn. Crim. App., Jackson, Nov. 7, 2006) (observing that it was unclear from the judgment forms, after two of the defendant's Class B felony convictions were merged, "which single conviction and sentence survive," and holding, "Accordingly, remand is necessary for entry of corrected judgment of conviction forms . . . to reflect which single conviction, either count four or count five, remains for Department of Correction purposes."); State v. Timmy Reagan, No. M2002-01472-CCA-R3-CD, 2004 WL 1114588, at *20 (Tenn. Crim. App., Nashville, May 19, 2004) ("Thus, in this case, neither two sentences nor separate judgments of conviction should have been entered, and the one judgment of conviction should reflect the merger of the defendant's convictions for premeditated murder and murder by placing or discharging an explosive device or bomb.").

## Conclusion

Based on the foregoing authorities and reasoning, we conclude that the trial court misconstrued its authority to grant a new trial under the thirteenth juror rule, Rule 33(d) of the Tennessee Rules of Criminal Procedure. Accordingly, we reverse the judgments of the trial court and remand for a new trial.

_____
DAVID H. WELLES, JUDGE

-13-